412

In the Matter of the County of Nassau, Respondent, Relative to Acquiring Title to Real Property, Known as Cow Meadow in the Town of Hempstead. Isidore Cohen et al., Appellants.

Second Department, June 29, 1970.

*Joseph A. Hoehlein* for appellants.

*Morris H. Schneider*, County Attorney (*A. Thomas Levin* of counsel), for respondent.

Hopkins, Acting P. J. The claimants were the owners of land comprising 7.161 acres used as a junkyard. The County of Nassau condemned the land; and the Special Term awarded the sum of $146,400 to the claimants as compensation for the taking. The claimants appeal, arguing that the award was inadequate; in particular, they contend that the Special Term did not assign proper weight to the singular characteristics of the use of the land in determining its value.

The junkyard had been operated by the claimants since 1950. Located in an industrial district, the junkyard was first a conforming use, but in 1951 the zoning ordinance was amended to prohibit the maintenance of junkyards in an industrial district. From 1951 until 1964, when this proceeding was begun, the junkyard was consequently a nonconforming use. During the entire period the land remained in an industrial zone.

The claimants' appraiser testified that the highest and best use of the property was as a junkyard. He considered that it had special value because of its special use; and he concluded that the property was worth $631,000, based on his estimate of $2 a square foot as a unit value. The county's appraiser, on the other hand, found that the land's highest and best use was for residential purposes. He noted that access to the parcel entered through surrounding residential areas of new development; and, in his opinion, it was likely that the present industrial district would become a residential zone by action of the municipal authorities. His appraisal valued the property at $114,400, purely on the assumption of a residential use and without giving any effect to the nonconforming character of the land as a junkyard.

The Special Term held that the land must be valued as though it were ready for use as a development for single-family homes and awarded a premium of an additional 20%, as the court said, "not for the taking of the business, but rather for the premature extinguishment of the nonconforming use." By this method, the Special Term found the value of the land to be $146,400.[1]

---

1. The Special Term thereafter reopened the proceedings to admit evidence as to a sale of a junkyard in 1966 in Nassau County. However, the court later decided that the evidence was not probative and adhered to its original determination.

To increase the award, the court found, would be "to compensate the claimant for the loss of his business."

The question thus arises whether the theory of the Special Term in treating the junkyard as a business, not compensable in eminent domain, and adding a premium to the value of the land for residential purposes because of the presence of the junkyard, was the appropriate method of evaluating the claimants' land. We think it was not.

The just compensation which the State Constitution directs shall be paid to the owner of land seized under the power of eminent domain is not measured by any fixed standard of value (N. Y. Const., art. I, § 7, subd. [a]; cf. *Matter of Board of Water Supply of City of N. Y.,* 277 N. Y. 452; *Onondaga County Water Auth.* v. *New York Water Serv. Corp.,* 285 App. Div. 655); the law looks to indemnity to the owner for the taking (*Matter of City of New York [James St.],* 21 N Y 2d 293; *Fonda, Johnstown & Gloversville R. R. Co.* v. *State of New York,* 29 A D 2d 240). The constitutional aim is effectuated through equitable principles applied for the benefit of the owner (*New York, Ontario & Western Ry. Co.* v. *Livingston,* 238 N. Y. 300).

Constitutional interests, too, are the compelling instruments in the creation of a nonconforming use. All zoning ordinances are restrictive in the sense that they regulate and control the use of land and thereby may diminish its value; yet, the restrictions may have the effect of enhancing the value of land where the provisions of the ordinances permit a use consonant with the greatest economic return and prevent uses of adjacent land which would result in a depreciation of value. In the same sense the provisions may interfere with the greatest economic use; and here the rule of vested rights intervenes to check the retroactive operation of an ordinance to prohibit the continuance of existing nonconforming uses of a substantial economic value to the owner (*People* v. *Miller,* 304 N. Y. 105, 109; *Town of Somers* v. *Camarco,* 308 N. Y. 537; 1 Anderson, American Law of Zoning, § 6.06).

The impact of the municipal zoning ordinance on the claimants' pre-existing use of their land as a junkyard was thus twofold: the use could not be halted, but only regulated (cf. *Town of Hempstead* v. *Goldblatt,* 9 N Y 2d 101, affd. *sub nom. Goldblatt* v. *Town of Hempstead,* 369 U. S. 590), and at the same time competing junkyards could not thereafter be established. The one effect tended to lower the value, the second

to increase the value.[2]  Hence, in determining the value of the land in this condemnation proceeding, the somewhat contradictory influences of the zoning restriction were necessarily to be weighed by the Special Term.

"Where property has a higher value because of a restricted use than what might otherwise be the value of the highest and best use of property so situated, the value resulting from the restrictive use is, of course, the highest and best use of that property" (*St. Agnes Cemetery* v. *State of New York,* 3 N Y 2d 37, 41).  The Special Term could not summarily dismiss from its consideration the use of the land as a junkyard on the theory that it was a business for which no valuation could be set; it was bound to take into account that a nonconforming use of the land as a junkyard existed and that the nonconforming use possessed a value arising out of the very restriction which made the use nonconforming (cf. Ann. 9 ALR 3d 291, 302–303).

It is true that zoning restrictions are subject to amendment as conditions change.  Some changes of conditions in the neighborhood or in economic factors are so evident that it may be said with reasonable probability that rezoning will occur in the imminent future; and the thrust of the evidence of the probable rezoning may properly be given weight in the determination of value in eminent domain (cf. *Genesee Val. Union Trust Co.* v. *State of New York,* 9 N Y 2d 795; *Masten* v. *State of New York,* 11 A D 2d 370, affd. 9 N Y 2d 796; *Brubaker* v. *State of New York,* 17 A D 2d 519).  Temporary uses allowed by a variance of a fixed duration, but with a reasonable expectation of an extension beyond the term, are similarly entitled to consideration in determining value (*Gottfried* v. *State of New York,* 14 A D 2d 612, affd. 11 N Y 2d 1084).  According to that rationale, nonconforming uses from which the owner derives a positive and demonstrable economic value must likewise be accorded a substantial factor in reaching a value in the condemnation of land.

The Special Term found that the claimants' land, though industrially zoned, should be valued as residential property.[3]

2. The claimants' appraiser testified that there were about 30 junkyards in Nassau County and that, though he had offered a price of $4 a square foot for the purchase of some junkyards located in the Town of North Hempstead, none of the owners would sell, since land for that purpose was not available in that town or adjoining towns.

3. Evidence at the trial showed that the industrial zoning of property immediately to the south of the claimants' property had been declared unconstitutional because of its unfitness for that use (*Horn Constr. Co.* v. *Town of Hempstead,* 41 Misc 2d 438); the Special Term relied on that decision in arriving at the conclusion that the claimants' property should be appraised as residentially zoned.

Moreover, it found that "[t]he fact that the Town Board could terminate this [nonconforming] use at any time materially lessens its value as compared with a permitted use" [word in brackets supplied].

Despite its character as a vested right protected from instant abolition by a subsequently enacted ordinance, the claimants' nonconforming use could be terminated by proper municipal legislation. But the legislation could not be arbitrary or unreasonable in its requirements; the prescribed plan of termination must afford a reasonable period of time to the owner to amortize his investment — a period of time related to the value of the investment, the possible relocation of the use, and the cost of the relocation, among other factors (*Matter of Harbison* v. *City of Buffalo,* 4 N Y 2d 553). In *Harbison,* for example, a period of three years to liquidate a junkyard was held to be inadequate (1 Anderson, American Law of Zoning, § 6.66, pp. 458–459; see, also, *Town of Hempstead* v. *Romano,* 33 Misc 2d 315). One commentator has suggested that the constitutional objective of safeguarding the investment of the owner in his land attained by amortization of a nonconforming use is nearly the twin of the objective served by the power of condemnation (1 Anderson, American Law of Zoning, § 6.70).

Nevertheless, the obvious exposure of the claimants' nonconforming use to conceivable extinction by a valid exercise of zoning authority, without more, is not in essence different from the expectation of a change in zoning. In both, the finding of the expected change, in order to modify the value of land to be fixed in eminent domain, must be seated on evidence that the change was reasonably probable (cf. *Matter of City of New York [East Riv. Drive]*, 264 App. Div. 555, 273 App. Div. 884, affd. 298 N. Y. 843). Here, no proof was offered to demonstrate that the municipal authorities contemplated the passage of an ordinance to end junkyards; or even proof of what period of amortization would satisfy the test of constitutional validity. Again, there was no evidence as to the extent to which a probable termination of the use would affect the value of the land.

In our opinion, nothing decided in *Matter of Port of N. Y. Auth. (Lincoln Tunnel)* (2 N Y 2d 296, modfg. 1 A D 2d 801) supports an opposite result. In that case it was found that the highest and best use of the condemned property was as a nonconforming parking lot; and the premium of 20% added to the value for the nonconforming use represented merely a method of making an evaluation of the total worth of the property as a nonconforming use. Here, the property was not

appraised in its character as a nonconforming use, but in a character as though it were residentially zoned and the nonconforming use terminated — though without foundation in the record as to the probable adoption of legislation requiring this outcome or the effect on the value of the property.

We are of the view, therefore, that the decree of the Special Term should be reversed, on the law, and the proceeding remanded to the Special Term for further proof, and a new determination, with costs to abide the event, so that the full scope of the factors combining to form an evaluation of the nonconforming use may be amplified in the record. The questions of fact have not been considered on this appeal. In short, the appraisal of the value of the land should consider the appropriate weight to be attached to the use and value of the land as a junkyard (even though the owners had conducted the operation as a business) and to the zoning aspects of the land, both current and reasonably probable in the future, put in proper perspective as of the time of the taking. In reaching this determination, we express no judgment as to the adequacy of the award made by the Special Term; we leave this question to the Special Term for decision after a consideration of the factors to which we have referred.

BENJAMIN, J. (dissenting). The Special Term found, on adequate proof, that the highest and best normal use of this property was as residential property; he valued it as such and then added on a 20% premium "for the specialized [i.e., nonconforming] use to which  *  *  *  [the owner] put his land" [matter in brackets supplied].[1] Regardless of Special Term's phraseology and method, he in effect valued the property as if its highest and best use were as a nonconforming junkyard.

The procedure he used in arriving at that valuation was precisely that used by the Special Term in *Matter of Port of N. Y. Auth.* (*Lincoln Tunnel*) (1 A D 2d 801, mod. 2 N Y 2d 296); in that case, as in this one, the Special Term expressly ruled that he was not valuing the nonconforming use as a business but was, instead, merely adding a premium to the value of the land because of the nonconforming use[2]; in that case, as in this one, there was no proof as to the probable remaining life of the nonconforming use; and in that case the procedure used

---

1. At another point he characterized the 20% premium as an award for "premature extinguishment" of the nonconforming use, but the difference between the two descriptions is merely one of phraseology, not substance; despite the seeming semantic difference, the premium in either case would be for the nonconforming use of the land.

2. See pp. 605–607 of the record on appeal in that case.

in arriving at the over-all valuation was approved by the Appellate Division and the Court of Appeals. And in this record there is adequate proof to support the basic valuation, the premium added on for the nonconforming use, and the over-all valuation.

If we were to assume *arguendo* that it was procedurally improper to value the land for residential use with a premium added on for the nonconforming use, the Special Term's overall valuation would nonetheless be supportable on this record. The county appraiser said the highest use was residential and he valued the land at about $17,000 an acre, cleared and filled, which on this record would be equivalent to a valuation of $25,500 an acre in the raw state; he added no premium for the nonconforming use. The claimants' appraiser said the highest use was as a junkyard and he valued the land at about $87,000 an acre in the raw state. The record established that other industrial use of the land was not feasible. The Special Term adopted the county appraiser's testimony of highest use and value, but then added on a 20% premium for the nonconforming use, thus arriving at a total valuation of about $20,400 an acre, cleared and filled, which would be equivalent to a total valuation of about $29,000 an acre in the raw state.

The Special Term's valuation thus was based on substantial evidence and was within the limits of the different appraisals in the record. He saw the property, knew the area, and had long experience in this field. His total valuation seems fair and it can and should be affirmed even if his approach to that valuation were deemed incorrect (cf. *Matter of City of New York* [*Coogan*], 20 N Y 2d 618, 624; *Sun Oil Co.* v. *State of New York*, 24 A D 2d 834). In *Sun Oil* the court affirmed a total award which it found fair, even though the Special Term had used an incorrect method in valuing the property. In *Coogan* (*supra*) there was widely divergent testimony as to highest use and value. Affirming the Special Term's valuation of $3.50 a square foot, the Court of Appeals made these pertinent comments (pp. 624–625):

" No witness testified to an opinion stating exactly this value. But there was a wide range of expert view as to value expressed in the record, related, in turn, to the further opinions of the witnesses as to what they thought would be the ' best use ' of the land; and the $3.50 per square foot found by the Special Term * * * lies well within the over-all range of this evidence. * * *

" The conclusion of the Special Term ' After extensive analysis of the problems presented ' that the land had a value of

' $3.50 per square foot overall ' &ast; &ast; &ast; [is] based on substantial evidence &ast; &ast; &ast; and &ast; &ast; &ast; [is] permissible on analysis of this record [matter in brackets supplied]. &ast; &ast; &ast;

'' It is &ast; &ast; &ast; a permissible factual evaluation in an area in which the Supreme Court, in its fact-finding role, is not bound rigidly to follow literally opinions expressed for its guidance &ast; &ast; &ast; and where it can be seen that what has been found lies within the compass of relevant proof.''

For the foregoing reasons I vote to affirm the award made by the Special Term.

MARTUSCELLO and BRENNAN, JJ., concur with HOPKINS, Acting P. J.; BENJAMIN, J., dissents in opinion in which MUNDER, J., concurs.

Final decree reversed, on the law, and proceeding remanded to the Special Term for further proof and a new determination in accordance with the opinion rendered herewith, with costs to abide the event.