JOHN P. GEBRIAN ET AL. *v.* BRISTOL REDEVELOPMENT AGENCY

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued April 14—decision released September 14, 1976

*L. Paul Sullivan,* for the appellants (plaintiffs).

*Robert C. Danaher,* with whom were *J. Jeffrey Almquist* and *Robert A. Wood,* for the appellee (defendant).

Loiselle, J. The defendant in eminent domain proceedings, on May 25, 1973, took land and buildings belonging to the plaintiffs in Bristol for redevelopment purposes and assessed damages of $73,500 for the taking. An appeal from the assessment of damages was taken by the plaintiffs and

the matter was referred to a referee for hearing. The referee, exercising the powers of the Superior Court, found the fair market value of the premises to be $94,800. The plaintiffs have appealed from this judgment.

Although attacked by the plaintiffs, the following facts found by the referee, hereinafter referred to as the court, cannot be disturbed: Prior to May 25, 1973, the day of taking, the plaintiffs, who are brother and sister, owned an irregularly shaped parcel of land with buildings thereon fronting on Middle Street in Bristol. The property had originally been a part of a farm of about seventeen acres owned by the plaintiffs' parents. The plaintiff John P. Gebrian lived on the property from his birth on August 25, 1933, until the date of taking. The plaintiff Julia Gebrian lives in Ohio. An older brother, Michael, lived on the property until 1964, except during the war years. The plaintiffs' father farmed the seventeen-acre farm until early 1950, maintaining work horses and cows and growing fruit and vegetables. In about 1936, the father first deposited junk on the farm and added to it thereafter. John and Michael, at about the age of thirteen, began collecting small items of junk as a source of spending money. John gradually expanded his activities by bringing to the farm larger articles such as bathtubs and old farm equipment, which he stored in piles on the farm. Michael had collected five automobiles by 1943, when he left for the Navy, but his father dismantled them, and only parts remained when he returned in 1946. Michael then began repairing and rebuilding storage batteries, and picked up and deposited various items of scrap or junk on the farm in connection with this business.

John graduated from high school in 1952, worked for an undisclosed period at Stanley Works and later, for a time, for his brother Michael in the battery business, and continued his scavenging for junk, which he deposited on the farm. John was an old-car enthusiast, and collected ten model A Ford cars. Beginning in 1952, he collected a number of inoperable motor vehicles and stored them on the farm. In 1955 he applied for permission to conduct an automobile junk yard on the farm, but withdrew the application. Michael obtained four annual junk dealer's licenses covering the years 1950 to 1952 and 1955 to 1957. John obtained annual junk dealer's licenses for the years 1957 up to the time of taking. The licenses were issued by the police on the basis of the suitability of the persons to whom they were issued. John did not sell any of the junk he collected.

On May 8, 1961, John and his sister Julia became owners of the seventeen-acre farm. In 1969, they sold about 8.38 acres of the land at the rear of the farm to an abutter for $50,500 or about $6026 per acre. Some of the junk which had been collected over the years was piled on the portion of the farm which was sold. The sale was a fair, arm's-length transaction. The 8.62 acres of the seventeen-acre farm remaining after the sale is the property in issue which was condemned by the defendant. The court inspected the premises with counsel. It has a two-story frame dwelling built around 1930, a two-story frame barn, a shed with a dirt floor used as a garage, a lean-to structure and two small sheds. The house is located 275 feet from the street and the area of about one and one-half acres in front of the dwelling was never used for the storage of junk. The land to the rear of the house is rough

terrain with depressed areas, in part roughly cleared and elsewhere covered by trees and brush. It was on the land now in issue to the rear of the house that a garden had been maintained and on which, as well as on the land sold in 1969, and in the outbuildings, that junk had been piled and stored. The neighborhood is made up of vacant land, old residences, industrial and commercial uses and some newer industrial buildings.

From 1931, when the city of Bristol adopted its first zoning ordinance, until the time of taking, the farm was in a zone where a junk yard was not a permitted use, save for the period from 1949 to 1959, when a junk yard, but not an automobile junk yard, was a permitted use. At the time of the taking the property was in an industrial zone.

Five appraisers testified before the court as to the value of the premises. Three of these were employed by the plaintiffs although only two were called as witnesses by the plaintiffs. These two appraisers valued the property as a special purpose property, that of a junk or scrap metal yard, and valued the land on a square-foot basis. One appraisal amounted to $743,800 and the other to $727,700. The third appraiser employed by the plaintiff and called as a witness by the defendant and the other two appraisers employed by the defendant all considered the highest and best use of the property to be for industrial purposes and valued the premises as such on an acreage basis. Their appraisals were $152,400, $77,600 and $81,900 respectively.

The court concluded that the property had a market value at the time of taking, that there was no private or special use which the property in issue

had for the plaintiffs which should be included as a significant element of value, that the highest and best use of the property at the time of taking was for industrial purposes as permitted by the applicable zoning ordinance, and that the land had a value of $11,000 an acre totaling $94,800.

The plaintiffs have made an extensive attack upon the finding, requesting that seventy-five paragraphs of their draft finding be added to the finding, that numerous paragraphs of the finding be deleted and that fifty-seven conclusions be substituted for the six made by the court. The sheer scope of the plaintiffs' challenges to the finding precludes any detailed discussion of them. As to the facts that the plaintiffs assert ought to have been found which they claim were admitted or undisputed, several were not briefed and are treated as abandoned. *Hall* v. *Weston,* 167 Conn. 49, 51, 355 A.2d 79; *Mahon* v. *Heim,* 165 Conn. 251, 252, 332 A.2d 69. Some requested additions either are implied in the finding, immaterial, not admitted or undisputed, or are merely cumulated details which would not directly affect the ultimate facts upon which the judgment depends. *Salvatore* v. *Milicki,* 163 Conn. 275, 277, 303 A.2d 734. The plaintiffs' claims that facts were found without evidence are not supported by the record. The claims that facts were found in a manner such as to cause doubt as to their significance are also without merit; findings may be corrected on that basis only when their meaning is unclear, not merely because they are unnecessary to the decision. Those facts which are undisputed and admitted have been added to the finding.

The main thrust of the plaintiffs' appeal is that the trial court erred in not finding that the premises enjoyed a valid nonconforming use as a junk yard,

which enhanced their value. The usual measure of compensation in condemnation is fair market value, defined as "the price that would probably result from fair negotiations between a willing seller and a willing buyer." *Connecticut Printers, Inc.* v. *Redevelopment Agency,* 159 Conn. 407, 410, 270 A.2d 549. The value placed on the land by the court is a matter of fact and cannot be changed on appeal unless it is clear that the court failed to weigh an element of value which properly should have been considered. *Birnbaum* v. *Ives,* 163 Conn. 12, 301 A.2d 262; *Edwin Moss & Sons, Inc.* v. *Argraves,* 148 Conn. 734, 173 A.2d 505.

The finding has incorporated the history of the zoning regulations from their initial enactment in 1931, and their amendments, to the time of the taking. The plaintiffs' premises were within a residential zone where no junk yards were permitted from 1931 to 1949. In 1949, the zoning regulations were changed so that plaintiffs' premises were rezoned to an industrial use that permitted junk yards. On July 3, 1957, an amendment to the zoning ordinance prohibited junk yards in all zones in Bristol. Unquestionably, between 1949 and 1957 the plaintiffs' premises could have legally been used as a junk storage yard.

No definition of a junk yard was included in the Bristol zoning regulations until 1968, long after junk yards were prohibited in all zones, when it was defined as "[m]ore than 50 square feet of space used for the accumulation of storage of waste, or discarded or used materials of any kind." In 1953, the General Statutes first defined a junk yard, in its chapter regulating junk dealers, as "any place in or on which old metal, glass, paper, cordage or

other waste or discarded or secondhand material, which has not been a part, or is not intended to be a part, of any motor vehicle, is stored or deposited." General Statutes § 21-9. At the time that plaintiffs' premises were legally allowed to be used as a junk yard between 1949 and 1957, the ordinance did not define what a junk yard was and the statutory definition would not be applicable as it is admitted that none of the Gebrians were carrying on a junk business. Although the court did not have the benefit of any legal definition as a guide, it is clear from the finding that the plaintiffs' premises were used as a repository of junk during the period from 1944 to 1957. The court did not find that the junk-yard use of the premises was a nonconforming use at the time of the taking. Under the circumstances, the plaintiffs were entitled to a finding that their premises enjoyed a valid, nonconforming use for the storage of junk. Such a determination is necessary because it is relevant to the ultimate issue of land value. See *State* v. *Huntington,* 145 Conn. 394, 143 A.2d 444. The status of the plaintiffs' premises as a nonconforming use for the storage of junk is added to the finding.

All zoning ordinances are restrictive in the sense that they regulate and control the use of land. Consequently, such restrictions may tend to affect land values. The restrictions may have the effect of enhancing the value of land where the use of particular land allows the greatest economic return and prevents uses of adjacent land to enjoy the same privileges. A nonconforming use may possess a value above that of surrounding land arising out of the very restriction which made the use nonconforming. Accordingly, nonconforming uses from which the owner derives a positive and demonstra-

ble economic value must be considered in reaching a value in the condemnation of land. *In re County of Nassau*, 34 App. Div. 2d 412, 312 N.Y.S.2d 66, appeal dismissed, 27 N.Y.2d 744, 263 N.E.2d 391; annot., 9 A.L.R.3d 291, 302–303.

Although the court should have found that the land enjoyed a nonconforming use as a storage place for junk, the court's conclusion and the memodandum of decision may be consulted to determine if harmful error was committed.

In its memorandum of decision, which may be consulted to ascertain whether an alternate fact situation was considered by the court; *Smith* v. *Usher*, 130 Conn. 204, 206, 33 A.2d 137; the court stated: "But even if he could legitimately claim his continuing activity to be a legal non-conforming use of the property it would be unreasonable to suppose that a purchaser seeking to acquire a profitable junk yard location could be attracted in view of the existing zoning restrictions." In effect, the statement assumes the validity of a nonconforming use, but finds it is without value in view of the effect of zoning restrictions on a buyer.

The court was not required to believe any of the appraisers who testified as to the value of the property for junk yard use, especially as the comparable sales they utilized in making their appraisals were based on value of properties used for profit-making ventures such as gas stations and banks. See *Bennett* v. *New Haven Redevelopment Agency*, 148 Conn. 513, 516, 172 A.2d 612. The plaintiffs claim that the defendant's appraisers ignored the nonconforming use and therefore their opinions should be rejected. A review of the record and the transcript, which was consulted under the provi-

sions of Practice Book § 628Q, clearly shows that this element was not considered by them because there was not a junk yard business operated on the premises. The possession of a junk dealer's license by the plaintiff John Gebrian and his brother Michael is not probative of the actual use of the land as a going junk yard business. Such licenses are granted solely on the basis of suitability of the licensee rather than the premises. *Clapp* v. *Ulbrich,* 140 Conn. 637, 641, 103 A.2d 195. The court also had before it the evidence of sale made four years before of half of the property, with an equally protected nonconforming use. No purchaser interested in a junk yard had been attracted at that time. The price per acre was about one-half the amount that was awarded by the court in the present case. The memorandum of decision indicates that the court considered the storage of junk as an element that must be weighed in the valuation of the premises but it stated that it was not "persuaded" that the property should be valued as a special purpose property. Although the court in its memorandum of decision did indicate the effect of the zoning restrictions on a buyer, this observation in no way diluted or affected the subordinate facts found which supported the conclusions reached that "[t]he highest and best use of the property at the time of taking was for industrial purposes as permitted by the applicable zoning ordinance." While a use may be nonconforming, whether the use makes the property more valuable is a question of fact for the court to decide. The court was not in error in not assessing any value to the status of the nonconforming use of the property in question.

The plaintiffs also complain that, even if a purchaser were interested in buying the property for

industrial use, he would be willing to pay a higher price because the prior nonconforming use would enable the industrial purchaser to store waste materials without building an enclosure as required by the Bristol zoning ordinance. That is an issue of fact for the court to decide and the failure to find in the plaintiffs' favor is error only if the court was totally unreasonable in its conclusions. The court, however, on the basis of the facts of this case, could have reasonably concluded that this attraction would not make the property more valuable.

The claim that the court erred in taking into account that the plaintiff did not sell the junk he accumulated is not well taken. This claim is made in regard to the assertion that the "special use" of the property by the plaintiffs demanded a higher valuation. The rule is that when real property is condemned, nothing should be included for loss of a business conducted thereon unless specifically authorized by statute. *Housing Authority* v. *Lustig,* 139 Conn. 73, 75, 90 A.2d 169. But the fact that a given business is in operation should be taken into account if the use is a factor in establishing market value. Id., 76, 77. As a buyer might be willing to pay more for land alone on which a profitable junk yard business was conducted, as such a business would indicate the suitability of the location for such an enterprise, the court did not err in weighing the absence of this factor. *Brothers, Inc.* v. *Ansonia Redevelopment Agency,* 158 Conn. 37, 44, 255 A.2d 836. It cannot be said that the court erred in considering the lack of an ongoing junk business on the premises as a factor which would carry weight with a purchaser.

The plaintiffs also argue that the court should have considered the loss of the junk yard use to the

plaintiffs as a factor which would affect their willingness to sell, and thus increase the market value of the property. Property which has no market value may be valued, for condemnation purposes, by some other method. 27 Am. Jur. 2d., Eminent Domain, § 268; annot., 42 A.L.R.3d 1314, 1323 § 5. The court concluded that the premises had a market value and the plaintiffs admit that such conclusion cannot be attacked but claim such market value does not include the special use as a junk yard. The court did conclude that the junk yard use did not enhance the value of the property to a willing buyer.

It is the duty of the trier of facts to reach his own conclusion as to the value of land, weighing all the circumstances bearing on value which are in evidence, the testimony of expert witnesses, and his own general knowledge of the elements which affect value. *Slavitt* v. *Ives,* 163 Conn. 198, 212–13, 303 A.2d 13; *Appeal of Cohen,* 117 Conn. 75, 85, 166 A. 747. Included in his consideration is the view of the property. *Birnbaum* v. *Ives,* 163 Conn. 12, 21, 301 A.2d 262; *Schnier* v. *Ives,* 162 Conn. 171, 177–78, 293 A.2d 1. And, as previously stated, the court also had the evidence of as comparable sale as is possible in a situation such as the present one, that about one-half of the original farm, or 8.38 acres with an accumulation of junk on it, had been sold at the rate of $6026 per acre for a total price of $50,500 in 1969 in an arm's-length transaction. From the facts found by the court it could reasonably conclude that the fair market value of the premises was $11,000 an acre, totaling $94,800.

There is no error.

In this opinion the other judges concurred.