[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this condemnation proceeding the defendant Commissioner of Transportation took, on January 12, 1990, a permanent drainage right of way easement consisting of 0.061 of an acre more or less and a temporary work area easement consisting of 0.048 of an acre more or less, on property in Old Lyme owned by the plaintiff Marian E. Taylor. The defendant, who was acting under General Statutes 13a-7b had assessed the resultant damages at $18,000.00 and then, pursuant to General Statutes 48-11 deposited this sum with the Clerk of the Superior Court for the Judicial District of New London.[1] The plaintiff has appealed from the Commissioner's assessment of damages and the appeal has been referred to the undersigned for hearing and judgment, a hearing was held at which appraisers for both parties testified and, thereafter the court viewed the subject property in the presence of counsel. As set out hereinafter, the court, which finds the plaintiff aggrieved, has determined that she is entitled to additional damages in the amount of $19,400.00 (which is to be added $4,015.00 — the uncontested amount assessed for damages to the temporary work area easement).
The plaintiff's property, which is located at 32 Neck Road also known as Connecticut Route #156 in Old Lyme, contains 1.75 acres which is 76,230 feet of land area. It is somewhat irregularly shaped. It is generally bounded on the east about 226 feet by Route #156, south about 250 feet more or less by one Sisti; west about 300 feet more or less along the waters of the Connecticut River and north about 254 feet more or less by one Noble. The plaintiff's north bound is on property used as a full service boat marina and its south is on residential property. The Taylor property lies in two zones: partly in a WF-20 district (Waterfront Business) and R-40 district (residential).
The plaintiff's property is improved by a one and half story CT Page 4441 Cape Cod residence with an attached garage and is accessed by a driveway from Route #156. This house was built in 1938 as was the driveway and the first floor living area encompasses 2,151 square feet. The grade of the property drops off below the grade of Route #156 to the house site, and then levels off with a somewhat downward slope through some wetlands to waterfrontage.
There has existed on this property since 1935 a ten foot wide drainage right of way ("the 1935 easement")[2] from Route #156 in favor of the State of Connecticut. This lies southerly of the Taylor residence toward the bound on Sisti. The permanent drainage right of way ("the 1990 easement") taken on January 12, 1990 is fifteen feet wide and is located immediately to the north of the 1935 easement. The area of the 1990 drainage easement is 0.061 of a acre more or less or 2,657 square feet. With this the drainage easements together total twenty-five feet in width. Immediately to the north of the 1990 easement is the temporary work area easement which encompasses 0.048 of an acre more or less on 2,091 square feet. The sum of $4,015.00 assessed by the commissioner as damages for this temporary work area easement is not in issue in this appeal.
Each party presented testimony through a qualified appraiser each of whom had prepared a detailed written appraisal report which is in evidence and which had been made available to the other party before trial. Robert Flanagan and Linda McQuillan were the expert witnesses for the plaintiff and defendant respectively. Both reached different opinions of fair market value in the before and after taking situation. Both utilized the sales method in opining on value. The two appraisers were the only witnesses who testified at the trial of this matter.
Flanagan, as the plaintiff's expert, gave his opinion on the plaintiff's case in chief, that the fair market value of the property before the taking of the 1990 easement was $547,000.00 and that that value after the taking was $520,000.00. His opinion was, therefore, that the loss in damages to the plaintiff was $27,000.00 (to which was to be added the uncontested figure of $4,015.00 for the temporary work area easement). It was his evidence that the highest and best use of this property was its present use as a single family residence.
McQuillan was of the opinion that the fair market value of the property before the taking was $1,209,120.00 and that that value after the taking was $1,195,091.00. Her opinion, therefore, was that the loss or damages to the plaintiff was $14,029.00 (to which was to be added the uncontested figure of $4,015.00). The defendant's assessment of the loss or damages to the plaintiff then, rounded off, comes to $18,000.00 which constitutes, according to the defendant, the just compensation to which the CT Page 4442 plaintiff is entitled. It was McQuillan's opinion that the highest and best use of the plaintiff's property was as "a marine assemblage to abutting marina or marine retail use" and she so testified.
In utilizing the comparable sales approach to valuation, Flanagan used four Old Lyme properties all of which were in residential zones.[4] He opted, however, to rely basically on one of these, a two-story Dutch Colonial residence which had been built in 1972 and which was sustained on 1.17 acres with 185 feet of waterfrontage on the Lieutenant River. Using this property, which had last been transferred in April 1989, as "the most useful value indicator" and making a plus 5% adjustment for time and location he arrived at $254.45 per square foot as the unit value indicator. Applying this value indicator to the plaintiff's property his estimate of value was $547,322.00 which he rounded to $547,000.00 as his opinion of fair market value before the taking. In arriving at his opinion of fair market value after the taking, Flanagan pointed that he had been unable to find any sales of properties which had drainage rights of way similar to that planned for the plaintiff's property and, therefore, he made an estimate for market reaction to this condition. It was his opinion that the restriction of uses caused by the defendant's plans for this property resulted in a 5% downward adjustment of the current value of the property.[5] Flanagan's opinion of value in the after taking situation was, therefore, $520,000.00.
On the other hand, McQuillian, in keeping with her opinion of the highest and best use as essentially of a marine commercial retail use employed, as comparables, properties located in Old Saybrook, East Lyme and Westbrook. She used these properties in other towns because such properties do not transfer frequently and she maintained that they were very similar as waterfront marine property. The Old Saybrook property which was zoned "marine commercial" has "riverfront" and its highest and best use was as "marine commercial." The East Lyme property which was zoned "commercial" was located on the Niantic River and its highest and best use was as a marina. The Westbrook property was zoned "commercial boating", had a "boat basin" and its highest and best use was as a marina. The most recent sales of the Old Saybrook and East Lyme properties were in 1988 and that of the Westbrook property in 1987. McQuillan inspected all these properties and it was her opinion that their value per square foot ranged from $14.96 to $16.97. She determined that, under the circumstances, the plaintiff's property had a fair market value of $16.00 per square foot as of the taking date. In addition, she opined in the before situation that the existing 1935 drainage easement would reduce the fair market value of the 2,000 square feet encompassed by it to the plaintiff by 33%; and that this encumbered area retained only 67% of its unencumbered value. Thus, in the before CT Page 4443 taking situation, McQuillan's opinion was that the fair market value of the plaintiff's property was $1,209,120.00.[6]
In her after taking valuation, McQuillan applied the unit value of $16.00 per square foot to the then unencumbered square footage of 71,573 square which yielded the value of $1,145,168.00. She then applied the $16.00 unit value to the now unencumbered 4,657 square feet of the property and using the 67% multiplier arrived at a value of $49,923.00. McQuillan's opinion of fair market value after the taking was $1,195,091.00 which was the total of $1,145,168.00 and $49,923.00.[7] Her ultimate opinion was that the plaintiff's damages from the taking of the 1990 easement was $14,029.00 (to which was to be added $4,015.00 for the temporary work area easement).
Thereafter, Flanagan testified in rebuttal. That testimony evolved mainly from his responses to a hypothetical question formulated by plaintiff's counsel in which he was asked assuming that McQuillan's before taking value of the 74,230 square feet of the unencumbered area was correct and that the highest and best use of the property was in the waterfront 20 zone whether he had an opinion about the procedure by which the value of the encumbered portions of the property was obtained. It is apparent that this inquiry called into question McQuillan's use of the 67% multiplier in her evaluation of damages. Flanagan said that he did have an opinion and candidly admitted that ". . . the percentage would be a judgment factor and of course all the appraisals — any — appraisal would dispute another one." He then gave his opinion and gave computations under two sets of circumstances.[8] In the first he substituted a 25% multiplier for McQuillan's 67% which yield his opinion of damages there in the amount of $31,887.00. In the second he "applied" a zero multiplier for McQuillan's 67% which yield his opinion there in the amount of $42,512.00.
At this point it is useful to set out certain legal principles involved in this appeal. The state cannot take the plaintiff's property without paying her just compensation for the taking. See e.g. Gentile v. Ives, 159 Conn. 443, 447, A.2d (1970). "The question of what is fair compensation is an equitable rather than a strictly legal technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily as he would have been had the property not been taken." Gentile v. Ives, supra 447-448 quoting from Colaluca v. Ives, 150 Conn. 521, 530, 191 A.2d 340 (1963);
 "When only a part of a tract of land is taken for the public use, `just compensation' includes recovery for the part taken and recovery from any damages visited upon the CT Page 4444 remainder which result from the taking. Bowen v. Ives, 171 Conn. 231, 238, 368 A.2d 82; Meriden v. Highway Commissioner, 169 Conn. 655, 659, 363 A.2d 1094. `The ordinary rule for measuring damages where a portion of a tract of land is taken is to determine the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter, taking into consideration the changes contemplated in the improvement and those which are so possible of occurrence in the future that they may reasonably be held to affect market value.' Lefebvre v. Cov, 129 Conn. 262, 265, 28 A.2d 5."
D'Addario v. Commissioner of Transportation, 172 Conn. 182,184-185, A.2d (1976). Thus, in a proper case, "also considered are any and all damages which will forseeably follow from the proper contracting of the project, including any and all damages to that- remainder which are a necessary rational and proximate result of the taking." Wakeman v. Commissioner of Transportation, 177 Conn. 432,434, 418 A.2d 78 (1979); Nichols, Eminent Domain (3d. Ed.) 14, 24, 14.243, 14.2431.
 "In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of differing opinions of witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises. E F Realty Co. v. Commissioner of Transportation, 173 Conn. 247, 253, 377 A.2d 302 (1977); Laske v. Hartford, 172 Conn. 515, 520, 375 A.2d 996 (1977); Gebrian v. Bristol Redevelopment Agency, 171 Conn. 565, 576, 370 A.2d 1055 (1976); Bowen v. Ives, 171 Conn. 231, 239, 368 A.2d 82 (1976); Slavitt v. Ives, 163 Conn. 198, 209, 303 A.2d 13 (1972)." D'Addario v. Commissioner of Transportation, 180 Conn. 355, 366, 429 A.2d 890 (1980).
Valuation is a question of fact "to be determined by the trier's independent judgment of what is just compensation." D'Addario v. Commissioner of Transportation, supra 369. "The purpose of offering in evidence the opinions of experts is to aid the trier to arrive at his own conclusion, which is to be reached by weighing those opinions in the light of all the circumstances CT Page 4445 in evidence bearing upon value and his own general knowledge of the elements going to establish it. . . ." Ultimately, the determination of the value of the land depend[s] on the considered judgment of the referee, taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties. . . ." Bennett v. New Haven Redevelopment Agency,148 Conn. 513, 516, 172 A.2d 612 (1961); See Gentile v. Ives, supra 451. The referee is the final judge of credibility of witnesses and the weight to be given their testimony. Morgan v. Hill,139 Conn. 157, 161, A.2d (1952). In this process the "trier's acceptance and use of the testimony in some points does not preclude its rejection on others." Morgan v. Hill, supra 162. The opinion of any expert is not binding on the court. Birnbaum v. Ives, 163 Conn. 12, 20, 30, A.2d 262 (1972). The visual observations made by the trier in a visit to the property is just as much evidence as evidence presented for his consideration under oath. Birnbaum v. Ives, supra.
 II
Upon turning to the issue of damages it appears that the plaintiff, given his claims, is dealing with this issue on two levels. First, Flanagan's written appraisal report and his testimony on the plaintiff's case in chief adduced his opinion of damages of $27,000.00 (to which he added $4,015.00 rounded off to $4,000.00 for the temporary work area easement). Second, when called in rebuttal his answers to the hypothetical question of plaintiff's counsel (which was not objected to) produced opinions, as set out above, of damages in the amount of $31,887.00 and $42,512.00 (to each of which would be added the $4,000.00 just referred to). The plaintiff's post-trial brief argues that "the evidence supports the determination of [Flanagan] which establishes total compensable damages in the range of $31,105.00 to $46,527.00." The analysis in that brief thus proceeds almost entirely upon the evidence adduced from McQuillan and Flanagan (on rebuttal) using the $16.00 per square foot unit value as applied to the multipliers of 67%, 25% and 0% all as already set out. The lower end of the range of the plaintiff's range, i.e. $31,105.00 is the total of Flanagan's direct evidence of damages of $27,000.00 plus the $4,000.00 while the upper end of the range i.e. $46,527.00 is the total of his use in his computating of the 0% "multiplier" which yield his opinion of damages as $42,512.00 which with his $4,000.00 would result in his brief figure of $46,512.00. The post-trial brief finally concludes asking an award of damages of $46,527.00, upon sustaining the appeal.
 A
The court turns initially to the plaintiff's claim in the written report and Flanagan's testimony that her damages were CT Page 4446 $27,000.00 (plus the $4,015.00) premised on the present use as residential. With reference to the comparable factors he used and particularly with reference to the comparable on Sand-piper Point Road on which he relied his adjustment was a plus five percent and that was made only for time and location. No adjustment was made for the fact that the plaintiff's house was fifty-three years old and the Sand-piper Point Road house was only twenty-eight years old, that the plaintiff's property had 1.75 acres of land and the other only 1.12 acres (almost one-third smaller), and that the plaintiff's house was a one and one-half story Cape Cod and the other a two-story Dutch Colonial. Flanagan admitted that he had not inspected the interior of Sand-piper Point Road. These considerations affect adversely the weight to be given to his testimony in this regard.
Evidence was also adduced by the plaintiff that certain effects of the taking involved considerations that impacted on the plaintiff's property. We have already noted that Flanagan finding no sales of properties with drainage rights of way similar to that planned by the state led him to estimate the market reaction to this condition to cause a 5% downward adjustment of the current market value of this property. Although at first appearance, this 5% downward adjustment might seem reasonable, an analysis of the evidence does not support this judgment call of the 5% percent discount.
Examining, however, the negative effects suggested, it is submitted do not satisfy this court that the plaintiff's burden has been sustained. See e.g. Edwin Moss Sons, Inc. v. Argraves,148 Conn. 734, 735, 173 A.2d 505 (1961). It is argued that the taking of the 1990 easement results in additional restrictive use of this area for normal residential purposes such as gardens, "space devoted to passive and active recreation uses, construction of structures necessary or desirable for the use of the property as a residential property."[9] The evidence adduced to here was very sparse and unilluminating. The plaintiff has owned this property for almost forty years and acquired it when the 1935 easement was already in place. There is no credible evidence that the area now involved has ever been used or sought to be used for any of the uses now claimed to be the subject of this additional restriction. The credible evidence does not prove that the balance of her property over and above the encumbered portion has been so used or sought to be used or that it is reasonably probable that any such use is even planned. A view of the property discloses that the area generally westerly of the area in question has several flourishing trees, plantings and a pleasant lawn area. This argument cannot be given the weight contended for.
Next, the plaintiff maintains that the notice of taking CT Page 4447 restricts the area for a new driveway. Asserting that the "present steep driveway access . . . is inefficient and dangerous," the plaintiff's expert says that "a more gradual slope is necessary to gain suitable vehicle access to this parcel in all types of weather" and that "the area to be encumbered by the drainage right of way would be the logical starting point for a driveway with a lesser slope." Flanagan's characterization of the present driveway as "steep" somewhat overstates the situation on the ground. "Steep," says Webster, is synonymous with "abrupt, precipitious, sheer" and his definitions of it include "having a side or slope approaching the perpendicular, mounting or following precipitiously; characterized by a very rapid increase or decrease." Webster's Third New International Dictionary. The driveway may not be characterized as "steep." It is fair to say that a more gradual slope of the driveway may be desirable. The plaintiff's property is located on Route #156, a state highway and, in order to relocate her driveway, she is required by General Statutes 13a-143a[10] to obtain a permit from the Connecticut Commissioner of Transportation. She recognizes that this is necessary and, yet, the is no evidence that she has ever communicated with Department of Transportation since 13a-143a
became the law in 1967. Nor has she contacted any independent engineer concerning this matter. This does not advance her argument here. The court is of the opinion that any suggestion by the plaintiff of obtaining such permit has not been raised to that of a reasonable probability but rests on speculation. It should not go unnoticed that the assertion that the driveway is inefficient and dangerous does not appear to have been productive of any action on her part to remedy this claimed condition where the driveway has existed since 1938 long before she owned this property. Parenthetically, the court does not recall any postings or signs in the area of the driveway suggesting that its use was dangerous. Moreover, Flanagan's statement that the area taken in 1990 "is the most logical starting point with a lesser slope" was not based on any information he had from any engineering source and he was candid in admitting that he was not an engineer. Again, while a more gradual slope of the present driveway would probably be desirable and more convenient, the court cannot accord the driveway argument that degree of force with which it is advanced. It does not, however, overlook that the 1990 permanent easement does bring the westerly bound of the new easement fifteen feet closer to the plaintiff's residence and that the width of permanent easement area has increased from ten to twenty-five feet.
Going on, the plaintiff argues that the 1990 taking results in the deposit of more highway sediment on this property at the outfall of the drainage pipe. Flanagan's report states that there is a buildup of sand, silt, oil and other highway sediments at the present time from the present drainage installation." "Buildup" CT Page 4448 is a relative term and the credible evidence does not bear out the grave implications of that term as used here. We note that as to the already existing 1935 drainage easement, there is no evidence of the state having permitted any improper buildup, no evidence of the state not having serviced and maintained the drainage easement and no evidence of any complaint from the plaintiff of any buildup on her property. In terms of the state maintaining and servicing the drainage operation, it can be presumed that the commissioner of transportation, in the absence of evidence to the, contrary has, as a public officer, has performed and will perform his duty. See e.g. Brookfield v. Candlewood Shores, Inc., 201 Conn. 1, 6,513 A.2d 1218 (1986); Balch Pontiac-Buick, Inc. v. Commissioner of Motor Vehicles, 165 Conn. 559, 568, 345 A.2d 520 (1973). It cannot be denied that such an easement serves to channel off the highway water, materials and the like. This, however, is in furtherance of the commissioner's duties which in part are "to coordinate and assist in the development and operation of a modern, safe, efficient . . . system of highway. . . ." General Statutes 13b-4. The commissioner had determined in the course of his duties that at this location the 1935 easement is to be implemented by the 1990 taking and this may well result in more highway "sediment" coming through the drainage easements. The state of the evidence is that there may be some buildup but that is not to say that the commissioner will not discharge his duties concerning it. Practically speaking, it is to be recognized that the increase in drainage area does involve the channeling of additional water and materials from Route #156.
Two additional matters should be addressed briefly. Flanagan indicated that the 1990 taking deprived the plaintiff of parking spaces maintaining that, assuming a commercial use of the property, certain parking spaces could potentially be put in the area of this taking. No engineer or professional with expertise in such matters has been consulted on this. This was so even though an expert appraiser such as Flanagan may give an opinion which is based in part on sources not themselves admissible if the sources are fairly reliable and the witness testifying has sufficient experience to evaluate that information. New Haven Savings Bank v. Valley Investors, 174 Conn. 77, 82, 384 A.2d 321
(1970); Tait and LePlante, Connecticut 7.16.8(c).
Finally, the plaintiff seems to argue that the alleged increase of traffic on Route #156 should somehow be factored in the damages to which she contends she is entitled in this proceeding. Assuming the factored predicate, she advances no authority to advance this proposition. Accordingly, this argument must be rejected. Accordingly as indicated elsewhere in this opinion, the court cannot on the law and credible evidence, accept the dollar claims for damages contended for by the plaintiff on her case in chief which includes the damages claimed in her CT Page 4449 written appraisal report.
 B
The court now discusses briefly the opinions expressed by Flanagan in his response to the hypothetical question above which yield opinions of damages of $31,887.00 and $42,512.00 to which he would add the undisputed damages of $4,000.00 for the temporary work area right of way.
In challenging the state's position that the plaintiff would, in the after situation, still retain sixty-seven percent of its unencumbered value, Flanagan's opinion, in his answers to hypothetical questions, were premised on the situations where the plaintiff in the after situation, would retain only twenty-five percent and zero percent. This court respectfully cannot accept either of these opinions as in any manner to change in any way its conclusion as to the damages to which the plaintiff is hereinafter held to be entitled.
 III
The plaintiff also claims that her appraiser Flanagan is entitled to $950.00 in fees. This sum of $750.00 is claimed for his written appraisal report and $250.00 for his trial testimony. The state agrees that he is entitled to the requested $750.00, which this court finds reasonable, and that amount is awarded. The state, however, opposes his request for the expert witness fee of $250.00.
Costs are the creature of statute and courts cannot tax them unless the statute clearly provides for them. See Doe v. Heintz, 204 Conn. 17,32, ___ A.2d ___ (1987); Rissing v. Tarkington, 113 Conn. 737,739, 157 A. 226 (1931); Waterbury v. Macken, 100 Conn. 407, 412,124 A. 5 (1924). "The term `costs of court' has a known technical meaning as well understood by lawyers as the term suit or prosecution." Drive-In Shop, Inc. v. Redevelopment Agency,24 Conn. Sup. 390, 391, 191 A.2d 345 (1963). The plaintiff is claiming the fee of Flanagan, his attendance and trial testimony as one of her costs under General Statutes 13a-77 which is Chapter 238 of the General Statutes as is 13c-76, the statute under which the state instituted this proceeding. Section 13a-77
entitled "Costs in appeals from awards in highway cases" provides: "In any appeal to the superior court taken under and by virtue of this part, when the appellant obtains an award from the court greater than the amount awarded by the commissioner, costs of court shall be awarded the appellant and fixed against the commissioner in addition to the amount fixed by the judgment." The fee requested here is authorized by 13a-17, it is reasonable, and it is allowed to the plaintiff as one of her "costs of court." CT Page 4450
The plaintiff is found to be aggrieved and has sustained her burden of demonstrating that her damages for the 1990 taking of the permanent right of way drainage are $19,400.00 (to which is added the $4,015.00 for the temporary work area easement). The amount of $19,400.00 represents an increase in damages of $5,400.00 over the $14,029.00 assessed by the defendant.
In addition, the amount of $750.00 to which the defendant had no objection, is allowed for Flanagan's appraisal fee. The sum of $250.00 which is found reasonable is allowed for Flanagan's trial attendance and testimony as a "cost" under General Statutes13a-77.
The appeal is sustained and judgment may enter in accordance with the foregoing.
ARTHUR H. HEALEY STATE TRIAL REFEREE
FOOTNOTES